IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| v. | : | DATE FILED: |
| JOSEPH DOUGHERTY | : | VIOLATIONS: |
| EDWARD SWEENEY | | 18 U.S.C. § 1962(d) (RICO |
| JAMES WALSH | : | conspiracy – 1 count) |
| FRANCIS SEAN O'DONNELL | | 18 U.S.C. § 1959 (violent crime |
| CHRISTOPHER PROPHET | : | in aid of racketeering – 1 count) |
| WILLIAM GILLIN | | 18 U.S.C. § 844(i) (arson – 3 counts) |
| WILLIAM O'DONNELL | : | 18 U.S.C. § 844(h) (use of fire to commit |
| RICHARD RITCHIE | | a felony – 2 counts) |
| DANIEL HENNIGAR | : | 18 U.S.C. § 844(n) (conspiracy to |
| GREG SULLIVAN | | commit arson – 1 count) |
| | : | Notice of Forfeiture |

## INDICTMENT

## COUNT ONE

THE GRAND JURY CHARGES THAT:

THE ENTERPRISE

1.     At all times relevant to this indictment, defendants

JOSEPH DOUGHERTY,
EDWARD SWEENEY,
JAMES WALSH,
FRANCIS SEAN O'DONNELL,
CHRISTOPHER PROPHET,
WILLIAM GILLIN,
WILLIAM O'DONNELL, and
RICHARD RITCHIE

and others known and unknown to the grand jury, were members of and associated with the

Ironworkers Local 401 ("the Enterprise").  The Ironworkers Local 401, including its leadership,

members, and associates constituted an enterprise as defined in Title 18, United States Code,

1

Section 1961(4), namely, a group of individuals associated in fact.  The Ironworkers Local 401

constituted an ongoing organization whose members functioned as a continuing unit for a

common purpose of achieving the objectives of the Enterprise.  The Ironworkers Local 401 was

engaged in, and the activities of which affected, interstate and foreign commerce.

### Structure of the Ironworkers Local 401

2.      The Ironworkers Local 401 is a local union affiliated with the International

Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers.  Members of the

Ironworkers Local 401 perform a variety of jobs, many related to the building construction field.

These jobs include the loading and unloading of any metal fixtures, the construction of any part

of any structure composed of metal, and the repair of any part of any structure composed of

metal.  The Ironworkers Local 401 operates in Philadelphia and in surrounding counties in

Pennsylvania.  The stated purpose of the union is to secure adequate wages, working conditions,

and employment opportunities for the members of the union.  Members of the union are required

to pay dues and other fees to the Ironworkers Local 401 from their earnings.

3.      The Ironworkers Local 401 is governed by an executive board which meets from

time to time.  The day-to-day operations of the Ironworkers Local 401 are managed by the

person in a position entitled "Business Manager-Financial Secretary-Treasurer".  The Business

Manager-Financial Secretary-Treasurer is the official representative of the Ironworkers Local

401 and oversees all the business of the union.

4.      The Business Manager-Financial Secretary-Treasurer is assisted in his duties by

four Business Agents.  The four Business Agents are responsible for, inter alia, ensuring that all

activities considered by the Ironworkers Local 401 to be "ironwork" being done within the

territory of the Ironworkers Local 401 are being performed by members of the Ironworkers Local

2

401. Two of the Business Agents typically cover Philadelphia and the other two Business Agents typically cover Bucks County, Chester County, Delaware County, and Montgomery County. However, the Business Agents regularly confer to coordinate their activities. The Ironworkers Local 401 provides the Business Agents with vehicles and mobile phones to carry out their assigned duties.

## Purposes of the Defendants

5.      The purposes of the defendants included, but were not limited to the following:

A.      To generate money for the Ironworkers Local 401 and its members and associates through the commission of various criminal acts including extortion, arson, destruction of property, and assault.

B.      To extort and force businesses and contractors to hire members of the Ironworkers Local 401.

C.      To protect the Ironworkers Local 401's territory from encroachment by non-union workers and members of other unions, especially the local carpenters' union, through violence, actual and implied threats of violence, and the cultivation and exploitation of the Ironworkers Local 401's reputation for violence.

D.      To conceal the existence of the Ironworkers Local 401's criminal activities from law enforcement detection through acts designed to obstruct justice.

E.      To cultivate connections within the local and state government to build support for the Ironworkers Local 401.

F.      To maintain relations with other building trade unions in Philadelphia to coordinate actions against non-union contractors.

3

### Manner and Means of the Defendants

6.     The overriding objective of the defendants and their associates was to control all activities which the Ironworkers Local 401 considered to be their jurisdiction, in other words, "ironwork," being performed within its territory. The defendants and their associates had a network of members, associates, members of other unions, and other persons friendly with the Ironworkers Local 401 who would identify construction projects which were not using members of the Ironworkers Local 401 to perform ironworking tasks. This network typically would report this work to the Ironworkers Local 401 by either contacting the union hall or contacting one of the Business Agents. This work being reported was not limited to work being performed by non-union ironworkers, but also included ironworking tasks being performed by other unions.

7.     Once the defendants and their associates identified an ironworking project in its territory being completed by someone other than a member of the Ironworkers Local 401, typically one of the Business Agents would approach the construction foreman. The Business Agent would implicitly or explicitly threaten the foreman with violence, destruction of property, or other criminal acts if the contactor did not hire members of the Ironworkers Local 401. The defendants and their associates usually required that half of the ironworkers on a construction site be members of the Ironworkers Local 401, although in some instances it required that all of the ironworkers be members of the Ironworkers Local 401. The defendants and their associates relied heavily on its well-earned reputation for violence and sabotage which had been built up in the community over many years to force contractors to hire members of the Ironworkers Local 401.

8.     If the contractor refused to accede to the defendants and their associates' demands, members and associates of the Ironworkers Local 401 would employ both legal and

4

illegal action to coerce, force, and extort the contractor to hire union ironworkers. One of the common means that the defendants and their associates would employ was the picket line. Some of the Ironworkers Local 401's picket lines were non-violent and designed to legally coerce contractors into hiring union labor. However, many of the defendants and their associates' picket lines used violence and threats of violence to force and illegally extort contractors into hiring members of the Ironworkers Local 401. The defendants and their associates on the picket line often would physically block and prevent non-union contractors from delivering employees and materials to the construction site. The defendants and their associates would also forcibly prevent trucks containing materials from being unloaded.

9.      If the threat or implementation of a picket line did not force the contactor to accede to the defendants' demands, defendants and their associates would assault employees of the non-union contractor and destroy property belonging to the non-union contractor and its employees. These actions included assaulting non-union employees with baseball bats, slashing the tires of vehicles, smashing vehicles with crow bars, cutting and changing the locks on construction sites, filling the locks with superglue, damaging construction equipment, stealing construction materials, and otherwise sabotaging the construction site.

10.      If the acts of violence and destruction of property did not force non-union contractors to hire members of the Ironworkers Local 401, defendants and their associateswould commit arson and significantly damage the construction equipment and the property under construction. These actions included setting fire to the construction site and the equipment being used, using an acetylene torch owned, provided, and maintained by the Ironworkers Local 401 to cut through the steel support columns of the building under construction, and using a sledgehammer to destroy or damage anchor bolts. The purpose of the arson and other sabotage

5

was not only to force the contactor to hire members of the Ironworkers Local 401, but also to send a message to other contractors that hiring non-union ironworkers would bring severe consequences.

11.    The defendants and their associates created "goon" squads composed of several members and associates who could be relied upon to commit assaults, arsons, and destruction of property against non-union contractors in an attempt to force them to hire unwanted, unnecessary, and superfluous union labor.  The members of the Ironworkers Local 401 colloquially referred to this criminal activity as "night work."  One such "goon" squad referred to themselves as the "T.H.U.G.'s" an acronym which stood for "The Helpful Union Guys."  The Ironworkers Local 401 outfitted one "goon" squad with an acetylene torch, gas, and oxygen tanks to commit the arsons.  The "goon" squads typically employed counter-surveillance techniques to avoid being detected by law enforcement.  The members of these "goon" squads understood that they would be rewarded by the Ironworkers Local 401 for committing these criminal acts by receiving preferential treatment on job assignments and by being appointed to positions of authority within the union.

12.    The defendants and their associates employed these means in order to force contractors to hire unwanted, unnecessary, and superfluous union labor.  Members of the Ironworkers Local 401 who were hired in this manner often performed little or no actual work. Members of the Ironworkers Local 401 occasionally bragged about being paid for not performing work and complained when the extorted contractors required the members to perform actual work or to work a full day.  The contractors' purpose in paying the union ironworkers was merely to prevent further acts of sabotage as described above.

13.     The defendants and their associates employed similar tactics when members of other local unions, especially the carpenters' union, performed what the defendants and their associates deemed to be ironworking tasks. The ironworkers union and the carpenters union have a long-standing dispute over whether certain construction tasks should be performed by ironworkers or carpenters. When the Ironworkers Local 401 determined that another union was performing what they deemed to be ironworking tasks, the defendants and their associates would prevent other unions from unloading ironworking materials, assaulted and conspired to assault workers from other unions performing ironworking tasks, and destroyed equipment being used by other unions to perform ironworking tasks, all in an attempt to extort property consisting of the other union employees' jobs and wages by the wrongful use of violence.

14.     In order to effectuate its purposes, the defendants and their associates used the Enterprise's considerable political influence with the state and local government to assist them its efforts against the non-union contractors. Despite occasional disputes over work being performed, the defendants and their associates also coordinated its picketing activities with other building trade unions to maximize its effectiveness against non-union contractors.

## Roles of the Defendants

15.     Defendant JOSEPH DOUGHERTY was the Business Manager-Financial Secretary-Treasurer of the Ironworkers Local 401. Defendant DOUGHERTY controlled the day-to-day operations of the Ironworkers Local 401, both legal and illegal. In particular, defendant DOUGHERTY coordinated the extortions of the non-union contractors. All of the Business Agents reported to and took orders from defendant DOUGHERTY. Defendant DOUGHERTY authorized, supervised, and controlled the criminal activity of the Ironworkers Local 401. Defendant DOUGHERTY instructed his Business Agents which projects to target for

7

extortions and which projects he did not want them to "sabotage." Defendant DOUGHERTY also determined how many union workers each contractor was required to hire to avoid being sabotaged by the Ironworkers Local 401. On occasion, defendant DOUGHERTY also authorized the use of union funds to subsidize and enhance the profits of union contractors taking over for non-union contractors after they had been extorted.

16. Defendant EDWARD SWEENEY was a Business Agent for the Ironworkers Local 401 who covered Philadelphia. Defendant SWEENEY was one of the most vocal supporters of using violence, arson, and other criminal conduct to force non-union contractors to use union labor, and to force other unions to stop performing what he believed to be ironworking tasks. On almost a daily basis, defendant SWEENEY received reports of non-union ironworkers performing ironworking tasks in Philadelphia from his network of informants. Defendant SWEENEY or another Business Agent typically then traveled to the job site, approached the contractor or foreman, and demanded that they hire union ironworkers. If the contractor refused, defendant SWEENEY implicitly or explicitly threatened the contactor with assault or destruction of property. Defendant SWEENEY, like the other Ironworkers Local 401 Business Agents, relied upon the union's reputation in the community for violence and sabotage. Defendant SWEENEY organized the Ironworkers Local 401 picket lines in Philadelphia and led the assaults and destruction of property which they caused. Defendant SWEENEY also arranged picket lines to forcibly prevent employees and materials of those contractors affiliated with the Ironworkers Local 401, including at time other unions, from accessing the construction site. If the contractor still refused to accede to his demands after threat and picket lines, defendant SWEENEY arranged for other members of the Ironworkers Local 401 to commit arson, destroy property and equipment, and otherwise sabotage the construction site in retaliation.

8

17.    Defendant JAMES WALSH was referred to as the Ironworkers Local 401's "hit man." Defendant WALSH committed several of the arsons, destruction of property, assault, and other criminal acts on behalf of the Enterprise. Defendant WALSH led a team of Ironworkers Local 401 members, usually including defendant WILLIAM GILLIN, that committed arson and destruction of various properties including: (a) an arson and destruction of property at a Quaker Meetinghouse being constructed at 20 East Mermaid Lane in Philadelphia, (b) an arson and destruction of property at a building being constructed or renovated at 4900 Grays Avenue in Philadelphia, and (c) an attempted arson and destruction of property at a construction site located at or near 85 Matthews Road in Malvern. Defendants JOSEPH DOUGHERTY, EDWARD SWEENEY, CHRISTOPHER PROPHET, FRANCIS SEAN O'DONNELL, and WILLIAM O'DONNELL outfitted defendants JAMES WALSH, WILLIAM GILLIN, and other members of the team with an acetylene torch to use to commit these arsons and destruction of property. Defendant WALSH committed these crimes in order to curry favor with the leadership of the Ironworkers Local 401 with the intention of increasing his position within the Ironworkers Local 401. Specifically, defendant JAMES WALSH intended that his criminal actions in furtherance of the Enterprise would earn him a seat on the Ironworkers Local 401's board of trustees and/or executive board.

18.    Defendant FRANCIS SEAN O'DONNELL was a Business Agent for the Ironworkers Local 401 who covered certain counties outside of Philadelphia. Defendant FRANCIS SEAN O'DONNELL supervised extortions, picket lines, attempted arsons, and other acts of sabotage on behalf of the Ironworkers Local 401. Defendant FRANCIS SEAN O'DONNELL coordinated his actions with defendant JOSEPH DOUGHERTY and the other Business Agents, defendants EDWARD SWEENEY, CHRISTOPHER PROPHET, and

9

WILLIAM O'DONNELL. Defendant FRANCIS SEAN O'DONNELL personally arranged and
authorized the attempted arson and destruction of property at a construction site located at or
near 85 Matthews Road in Malvern.

19.    Defendant CHRISTOPHER PROPHET was a Business Agent for the Ironworkers
Local 401 who covered certain counties outside Philadelphia. Defendant CHRISTOPHER
PROPHET supervised extortions, picket lines, assaults, and other acts of sabotage on behalf of
the Ironworkers Local 401. Defendant CHRISTOPHER PROPHET coordinated his actions with
defendant JOSEPH DOUGHERTY and the other Business Agents, defendants EDWARD
SWEENEY, FRANCIS SEAN O'DONNELL, and WILLIAM O'DONNELL. Defendant
CHRISTOPHER PROPHET personally coordinated and supervised the destruction of property
of a Toys R Us store being constructed at or near 160 North Gulph Road, King of Prussia and an
assault with baseball bats of certain non-union workers at that construction site.

20.    Defendant WILLIAM GILLIN was a member of the Ironworkers Local 401 and
part of their "hit team" with defendant JAMES WALSH which committed the arsons, destruction
of property, and other criminal acts on behalf of the Enterprise. Defendant GILLIN colloquially
referred to these criminal acts as "night work". Defendant GILLIN participated in numerous
criminal acts in furtherance of the Enterprise, including: (a) an arson and destruction of property
at a Quaker Meetinghouse being constructed at 20 East Mermaid Lane in Philadelphia, (b) an
arson and destruction of property at a building being constructed or renovated at 4900 Grays
Avenue in Philadelphia, and (c) an attempted arson and destruction of property at a construction
site located at or near 85 Matthews Road in Malvern. Defendant GILLIN committed these acts
with the intention of maintaining or increasing his position with the Enterprise.

10

21.    Defendant WILLIAM O'DONNELL was a Business Agent for the Ironworkers Local 401 who covered Philadelphia with defendant EDWARD SWEENEY. Defendant WILLIAM O'DONNELL participated in the extortions of the contractors who did not hire members of the Ironworkers Local 401 by communicating the explicit and implicit threats from the Enterprise. Defendant WILLIAM O'DONNELL was aware of the acts of violence and destruction of property being committed by other members of the Ironworkers Local 401 and used the reputation of the Enterprise to force contractors to hire union labor.

22.    Defendant RICHARD RITCHIE was a member of the Ironworkers Local 401. Although not a Business Agent, defendant RITCHIE exerted considerable influence within the Enterprise. Defendant RITCHIE was a vocal advocate for the use of violence and the threat of violence to force contractors to hire union labor. Defendant RITCHIE bragged that he taught defendant WILLIAM O'DONNELL how to use the threat of force to extort non-union contractors into hiring union labor. Defendant RITCHIE personally participated in (a) an assault with baseball bats of certain non-union workers at a Toys R Us store being constructed at or near 160 North Gulph Road, King of Prussia and (b) the extortion of a non-union contractor at a construction site near the intersection of 30th Street and Market Street in Philadelphia.

<u>THE RACKETEERING CONSPIRACY</u>

23.    From on or about January 1, 2010, to on or about the date of this indictment, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH DOUGHERTY,
EDWARD SWEENEY,
JAMES WALSH,
FRANCIS SEAN O'DONNELL,
CHRISTOPHER PROPHET,
WILLIAM GILLIN,
WILLIAM O'DONNELL, and
RICHARD RITCHIE**

and other persons known and unknown to the grand jury, being persons employed by and associated with the Ironworkers Local 401, as described more fully in paragraphs 1-22 above, an enterprise which was engaged in, and the activities of which affected, interstate and foreign commerce, knowingly combined, conspired, confederated, and agreed together and with other co-conspirators known and unknown to the grand jury, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Ironworkers Local 401, through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), as set forth in paragraphs 24 and 25 below.

## PATTERN OF RACKETEERING ACTIVITY

24.     The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), through which the defendants and their co-conspirators agreed to conduct and participate in the conduct of the affairs of the Enterprise, consisted of:

        A.     multiple acts indictable under the following provisions of federal law:

                1.     Title 18, United States Code, Section 1951, Interference with Commerce by Threats and Violence – Extortion and Conspiring to do so; and

                2.     Title 18, United States Code, Section 844(i), Malicious Damage by Means of Fire of a Building Used in Interstate Commerce and Conspiring to do so; and

        B.     multiple acts and threats involving:

                1.     Extortion, chargeable under Title 18, Pennsylvania Consolidated Statutes Annotated, Sections 3923, 901, 902, and 903;

      2.      Arson, chargeable under Title 18, Pennsylvania Consolidated Statutes Annotated, Sections 3301, 901, 902, and 903.

25.     It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

## MANNER AND MEANS OF THE CONSPIRACY

26.     To further their goals of controlling all activities which defendants and their associates considered to be in the jurisdiction of the Ironworkers Local 401, in other words, "ironwork," being performed within its territory, the defendants and their associates damaged property and approached, threatened, and extorted contractors into hiring members of the Ironworkers Local 401. The primary purpose of this activity was to generate money for the Ironworkers Local 401 and its members.

27.     Among the means and methods by which the defendants and their associates agreed to conduct and participate in the conduct of the affairs of the enterprise were the following:

      a.      Members of the enterprise and their associates used, attempted, and conspired to use extortion, as defined in 18 U.S.C. § 1951 and for purposes of 18 Pa. C.S. § 3923, by obtaining, attempting to obtain and conspiring to obtain contractors' property consisting of (i) wages and employee benefits to be paid for unwanted, unnecessary and superfluous labor; (ii) wages and employee benefits to be paid pursuant to labor contracts with Local 401; and (iii) business contracts and the proceeds and profits from such contracts for the performance of work at construction project locations in Philadelphia, Pennsylvania and surrounding counties;

13

b.     Members of the enterprise and their associates used, attempted, and conspired to use extortion, as defined in 18 U.S.C. § 1951 and for purposes of 18 Pa. C.S. § 3923, by obtaining, attempting to obtain and conspiring to obtain property of the employees of contractor employers consisting of jobs, wages and employee benefits to be paid pursuant to labor contracts with such employees' labor unions other than Local 401;

c.     Members of the enterprise and their associates used, attempted, and conspired to use arson, as defined in 18 U.S.C. § 844(i) and 18 Pa. C.S. §§ 3301, as a tool to extort contractors to hire union ironworkers, to punish those contractors who refused to hire union ironworkers, and to send a message to other contractors in that refusal to hire union ironworkers would result in serious financial consequences.

## Episode #1

28.     Between May and June 2010, members of the Ironworkers Local 401 picketed a construction site of a store being erected near the King of Prussia Mall because the contractor failed to hire union ironworkers. These pickets were organized by the business agent for that area, defendant CHRISTOPHER PROPHET. In retaliation for the contractor failing to hire union ironworkers, members of the Ironworkers Local 401 sabotaged the construction site by flattening out approximately 80 anchor bolts which were cemented into the buildings support column bases and damaging the control panel on a piece of construction equipment. Three members and associates of the Ironworkers Local 401, including defendant RICHARD RITCHIE, later assaulted some of the non-union workers with baseball bats, resulting in serious injury. After the assault, defendant CHRISTOPHER PROPHET provided police with false information about the identities of the assailants and their connection to the Ironworkers Local 401 in an attempt to obstruct their investigation.

14

**Episode #2**

29.      In December 2012, members of the Ironworkers Local 401, including defendant

EDWARD SWEENEY, approached a non-union contractor building a new place of worship

located in Philadelphia.  When the contractor refused defendant SWEENEY's overtures to hire

union ironworkers, a team of ironworkers including defendants JAMES WALSH and WILLIAM

GILLIN and DANIEL HENNIGAR, charged elsewhere, significantly damaged the construction

site through the use of fire and other means.  Defendants WALSH and GILLIN set a crane on

fire, used a torch to cut some of the steel beams and bolts supporting the new structure, and

caused approximately $500,000 in damage to the property.

**Episode #3**

30.      In the summer of 2012, the Ironworkers Local 401 and other building trade unions

in Philadelphia began to picket a construction company because the unions did not believe that

the company hired enough union construction workers.  Defendant EDWARD SWEENEY

approached an official with this company and stated that if the contractor attempted to get a

crane on the construction site to perform ironwork, he (defendant SWEENEY) would burn it

down.  As part of this dispute with this company, defendant JAMES WALSH attempted to attack

a non-union employee of the company with a crow bar and damaged the non-union employee's

vehicle.

**Episode #4**

31.      In the summer of 2013, the Ironworkers Local 401 began to picket the

construction of a building in Philadelphia because the contractor did not hire any union

ironworkers.  Defendant EDWARD SWEENEY approached the contractor and demanded that

he hire at least two members of the Ironworkers Local 401.  When the contractor refused,

members of the Ironworkers Local 401 on the picket line physically and forcibly attempted to block the contractor from delivering employees and materials to the construction site. Members of the Ironworkers Local 401 put their own locks on the gates of the construction site and put superglue in the original locks on the gates. Later the same day, members of the Ironworkers Local 401 put superglue in the locks of another non-union construction van and flattened a tire on the same van by removing the valve stem. Defendant EDWARD SWEENEY pulled out a knife and slashed the tire of a vehicle owned by the contractor. When the contractor began work on another construction site in Ridley, Pennsylvania, members of the Ironworkers Local 401, led by defendant FRANCIS SEAN O'DONNELL, employed similar tactics in an attempt to force the contractor to hire union ironworkers at that construction site. Members of the Ironworkers Local 401, organized by defendant FRANCIS SEAN O'DONNELL, attempted to physically and forcibly block the contractor from delivering material and employees to the construction site. The owner of the construction site eventually agreed to hire two members of the Ironworkers Local 401 to end the harassment and sabotage.

### Episode #5

32.     In July 2013, defendants JOSEPH DOUGHERTY, EDWARD SWEENEY, WILLIAM O'DONNELL, JAMES WALSH, and other members of the Ironworkers Local 401 were involved in an extortion of a non-union builder of an apartment complex near the intersection of 31st Street and Spring Garden Street in Philadelphia. The steel work was being performed by a non-union contractor. Operating under the orders of defendant DOUGHERTY, defendants SWEENEY and WILLIAM O'DONNELL approached the contractor and demanded that he hire unwanted and unnecessary union labor. When the contractor refused, defendants SWEENEY and WILLIAM O'DONNELL set up a picket line and implicitly threatened the

16

contractor with physical violence and destruction of property if the contractor did not hire union workers. After receiving these implicit and explicit threats, the contractor relinquished his profits in this job and turned the project over to a union-affiliated contractor.

## Episode #6

33.     In July 2013, defendants JOSEPH DOUGHERTY, EDWARD SWEENEY, JAMES WALSH, and WILLIAM GILLIN were involved in an extortion of a contractor who was building a warehouse in Philadelphia who was not using union labor. When defendant SWEENEY discovered that this project was using non-union labor, defendants WALSH and GILLIN intentionally damaged the building by means of fire. Defendants WALSH and GILLIN used an acetylene torch or "hot wrench" to cut the steel support columns and caused considerable damage to the property in retaliation for the contractor not using union labor. The acetylene torch used was owned by the Ironworkers Local 401 and provided by defendants SWEENEY and DOUGHERTY. After the property was damaged, the contractor hired a union-affiliated builder to fix the columns and finish the job.

## Episode #7

34.     During the summer of 2013, the Ironworkers Local 401 got into a dispute with another building trade union over the other union allegedly performing ironwork at a building being constructed near the intersection of 19th Street and Arch Street in Philadelphia. When the Ironworkers Local 401 learned about this alleged jurisdictional encroachment, members of the Ironworkers Local 401 led by defendant WILLIAM O'DONNELL physically blocked the other union from unloaded building materials at the construction site. When defendant WILLIAM O'DONNELL got into a dispute with a member from this other union, defendant EDWARD SWEENEY encouraged him to attack him by stating "knock him out." Defendant SWEENEY

then began placing phone calls to members of the Ironworkers Local 401 whom he referred to as "goons" to come down to the construction site to prepare for the possible street brawl with members of the other union. Defendants SWEENEY and JOSEPH DOUGHERTY then contacted the construction contractor and tried to force him into hiring more members of Ironworkers Local 401 for the site to perform the work being done by the other union.

**Episode #8**

35.     Sometime in 2012, defendants WILLIAM O'DONNELL and RICHARD RITCHIE identified a non-union contractor working near the intersection of 30th Street and Market Street in Philadelphia. Defendant WILLIAM O'DONNELL initially approached the contactor and demanded that he hire union ironworkers but the contractor refused. Defendant RITCHIE then approached the contractor and implicitly and explicitly threatened him with violence and destruction of property if he refused to hire union ironworkers.

**Episode #9**

36.     In September 2013, the owner of a non-union construction company from out-of-state contacted the Ironworkers Local 401 to hire two unwanted and unnecessary union ironworkers. The non-union construction company only hired the union ironworkers to prevent the Ironworkers Local 401 from "sabotaging" their construction site. Specifically, the contractor told defendant JOSEPH DOUGHERTY that they had heard "horror stories up there that we're going to piss off this union and then they're going start sabotaging our . . . equipment and stuff." Defendant EDWARD SWEENEY sent two members to the job site, including defendant JAMES WALSH. Defendant WALSH expected to show up and not do any work. Defendant WALSH bragged to other employees that he got paid at his last job for just standing around. The contractor understood that they were "paying both of them to do nothing" in order to prevent the

18

Ironworkers Local 401 from "sabotaging" their construction site. In October 2013, when the contractor fired defendant WALSH, defendants SWEENEY and WALSH threatened to "sabotage" the contractors equipment in retaliation. Afterwards, defendant DOUGHERTY ordered defendant SWEENEY not to sabotage this contractor, but authorized the actions described in Episode #11 below.

### Episode #10

37.     In October 2013, defendant EDWARD SWEENEY received information from another union about a non-union contractor performing ironwork near the intersection of Race Street and Columbus Boulevard in Philadelphia. Defendant SWEENEY sent members of the Ironworkers Local 401 to the construction site and ordered them to physically block the contractor from unloading construction materials. Defendant SWEENEY then approached the contractor and extorted him into hiring union laborers for this project. Since the other union provided the information, defendant SWEENEY agreed that the contractor had to hire one member of the Ironworkers Local 401 and one member from this other union. Defendant SWEENEY acknowledged that the union labor was unnecessary because the union laborers did not even know how to perform the work being done at this construction site.

### Episode #11

38.     In early October 2013, the Ironworkers Local 401 received information that a non-union construction company started work on a site in Malvern, PA. Defendants JOSEPH DOUGHERTY, EDWARD SWEENEY, FRANCIS SEAN O'DONNELL, JAMES WALSH, and WILLIAM GILLIN formed a plan to commit burn and otherwise sabotage this construction site in retaliation for the contractor's failure to hire union ironworkers. Defendant WALSH already had an acetylene torch which defendant DOUGHERTY had given him from a previous

arson. Defendant WALSH refilled the canisters for the torch's oxygen and gas and sent the bill for the oxygen and gas tanks to the Ironworkers Local 401. Defendants WALSH and FRANCIS SEAN O'DONNELL reconnoitered the location prior to the attempted arson. Defendants WALSH and GILLIN and GREG SULLIVAN, charged elsewhere, drove to the construction site with the torch with the intention of destroying the construction site. After defendants WALSH and GILLIN entered the construction site with the torch, but before they could do any damage, they were arrested by police.

OVERT ACTS

1.      On or about May 28, 2010, defendant CHRISTOPHER PROPHET organized the vandalism of a construction site in King of Prussia in retaliation for the contractor's failure to hire any union ironworkers.

2.      On or about June 23, 2010, defendant CHRISTOPHER PROPHET organized the assault of two employees of a non-union contractor at a construction site in King of Prussia in retaliation for the contractor's failure to hire any union ironworkers.

3.      On or about June 23, 2010, defendant RICHARD RITCHIE attacked two employees of a non-union contractor at a construction site in King of Prussia in retaliation for the contractor's failure to hire any union ironworkers.

4.      On or about June 23, 2010, defendant CHRISTOPHER PROPHET provided false information to police officers investigating the assault of non-union employees at a construction site in King of Prussia.

5.      On or about December 3, 2012, defendant JAMES WALSH attempted to attack a non-union employee with a crow bar at a construction site in retaliation for the contractor's failure to hire union ironworkers.

6.      On or about December 3, 2012, defendant JAMES WALSH damaged a non-union employee's vehicle with a crow bar at a construction site in retaliation for the contractor's failure to hire union ironworkers.

7.      On or about December 5, 2012, to bolster support for the Ironworkers Local 401's enterprise, defendant JAMES WALSH bragged about damaging a non-union employee's vehicle with a crow bar at a construction site in retaliation for the contractor's failure to hire union ironworkers. Specifically, defendant WALSH texted, "Yea lol he used to drive a caddilac dts. It is no longer operational."

8.      On or about December 14, 2012, defendants JAMES WALSH and WILLIAM GILLIN planned to commit burn and otherwise destroy property belonging to a non-union contractor in retaliation for the contractor failing to hire union ironworkers.

9.      On or about December 17, 2012, defendant EDWARD SWEENEY approached a non-union contractor building a place of worship in Philadelphia to demand that the contractor hire union ironworkers.

10.     On or about December 18, 2012, defendants JAMES WALSH and WILLIAM GILLIN planned to burn and otherwise destroy property belonging to a non-union contractor in retaliation for the contractor failing to hire union ironworkers. Defendant WALSH texted defendant GILLIN, "I m ready to go  2 come alongs  2 new bolt cutters  20 ft rope."

11.     On or about December 20, 2012, defendants JAMES WALSH and WILLIAM GILLIN continued their planning to burn and destroy property belonging to a non-union contractor in retaliation for the contractor failing to hire union ironworkers. Specifically, defendant WALSH texted defendant GILLIN, "Why can t dan drive gonna rain good for cover wanna get there before lastout."

21

12.     On or about December 20, 2012, defendants JAMES WALSH and WILLIAM GILLIN set a crane on fire, used an acetylene torch to cut some of the steel beams and support bolts, and otherwise damaged a construction site in Philadelphia in retaliation for the contractors' failure to hire union ironworkers.

13.     On or about December 21, 2012, defendant EDWARD SWEENEY congratulated defendant JAMES WALSH for the destruction of property at the construction site the day before by texting him, "Nice swing."

14.     On or about December 21, 2012, defendant JAMES WALSH instructed defendant WILLIAM GILLIN to bring the acetylene torch which had been provided to them by defendants JOSEPH DOUGHERTY and EDWARD SWEENEY to damage a construction site in Philadelphia on December 20, 2012, back to the union hall.

15.     On or about December 22, 2012, defendant WILLIAM GILLIN provided advice to defendant JAMES WALSH on how to avoid being caught on their next outing to destroy property.  Specifically, defendant GILLIN texted to defendant WALSH, "We should of shut r phones off have to get a way to communicate next time."  Defendant WALSH replied that the next time they should use "2 way radio."

16.     In early May 2013, defendant EDWARD SWEENEY approached a non-union contractor in Philadelphia and threatened him with destruction of property if he did not hire union ironworkers.  Defendant SWEENEY also threatened that he and other members of the Ironworkers Local 401 would physically prevent the contractor from delivering materials and employees to the construction site if he refused to hire union ironworkers.

17.     On or about May 30, 2013, defendant EDWARD SWEENEY arranged for members of the Ironworkers Local 401 to flatten the tire of a non-union employee by removing

22

the valve stem, to put their own locks on the gates of a construction site, and to put superglue in the original locks on the gates in retaliation for the contractor's failure to hire union ironworkers.

18. On or about May 31, 2013, defendant EDWARD SWEENEY used a knife to slash the tire of a non-union contractor at a construction site in retaliation for the contractor's failure to hire union ironworkers.

19. On or about June 4, 2013, defendant EDWARD SWEENEY promised a non-union contractor that if he hired two union ironworkers, the destruction of property and other harassment of his employees by the Ironworkers Local 401 would end. Specifically, defendant SWEENEY stated, "all you got to do is hire a couple of guys". Defendant SWEENEY further promised that if the contractor hired the union ironworkers, the Ironworkers Local 401 would repay the contractor for the damage which they caused. Specifically, defendant SWEENEY stated, "if one of my guys did something to one of your trucks and we have to square it away, I'll square it away with you."

20. On or about June 6, 2013, defendant EDWARD SWEENEY promised a non-union contractor that if he hired two union ironworkers, the destruction of property and other harassment of his employees by the Ironworkers Local 401 would end. Specifically, defendant SWEENEY promised that if the contractor agreed to hire two union ironworkers, he would call the Ironworkers Local 401 picketers at the construction site and "tell them right now to take that [picket] line down now."

21. On or about June 17, 2013, a member of the Ironworkers Local 401 ("Member TH") approached a non-union contractor who was currently being picketed by the Ironworkers Local 401 for failing to hire union ironworkers. Member TH told the non-union contractor that he should hire union ironworkers. Specifically, Member TH stated, "It's not worth getting your

job fucked up or somebody getting fucking hurt". Member TH further told the non-union contractor, "I've been union my whole life. So, every fucking bid you have consequences, you know?"

22.     On or about July 12, 2013, defendant WILLIAM O'DONNELL approached a non-union contractor working at a construction site near the intersection of 31st Street and Spring Garden Street and demanded that he hire union workers.

23.     On or about July 12, 2013, defendants EDWARD SWEENEY and WILLIAM O'DONNELL planned to set up a picket line to block the side and back gates of a construction site located near the intersection of 31st Street and Spring Garden Street to prevent the contractor from delivering material and employees to the site in an attempt to force the non-union contactor to hire union workers.

24.     On or about July 12, 2013, defendant EDWARD SWEENEY contacted a union contractor and suggested that he contact a contractor at a construction site located near the intersection of 31st Street and Spring Garden Street about hiring union ironworkers.

25.     On or about July 12, 2013, defendant WILLIAM O'DONNELL reported to defendant EDWARD SWEENEY that their attempts to block the side and back gates of a construction site located near the intersection of 31st Street and Spring Garden Street to prevent the contractor from delivering material and employees to the site had failed because trucks and the crane had already been delivered to the site.

26.     On or about July 12, 2013, defendant WILLIAM O'DONNELL reported to defendant EDWARD SWEENEY that the contractor at a construction site located near the intersection of 31st Street and Spring Garden Street had offered to hire one union ironworker in

24

exchange for the Ironworkers Local 401 harassment to end. Defendant SWEENEY rejected that proposal and stated that the contractor had to hire at least two union ironworkers.

27.     On or about July 12, 2013, defendant EDWARD SWEENEY called an associate and asked her to call him if she saw a contractor working at a building located at 4900 Grays Avenue performing ironworking tasks.

28.     On or about July 12, 2013, defendants EDWARD SWEENEY and JAMES WALSH planned to burn and otherwise sabotage the construction site located at 4900 Grays Avenue for the contactors failure to hire union ironworkers. Defendant WALSH reported to defendant SWEENEY that he had taken the "hot wrench" or acetylene torch from the Ironworkers Local 401 training facility but that he needed to refill it.

29.     On July 13, 2013, defendant JAMES WALSH reported to defendant EDWARD SWEENEY that he had placed in his yard the acetylene torch which they intended to use to burn property at the 4900 Grays Avenue building in retaliation for the contractor's failure to hire union ironworkers.

30.     On or about July 13, 2013, defendants EDWARD SWEENEY and JOSEPH DOUGHERTY agreed to extort a contractor at a construction site located near the intersection of 31st Street and Spring Garden Street over his failure to hire enough union ironworkers. Defendant DOUGHERTY rejected a proposal by the contractor to hire one union ironworker and a proposal by SWEENEY that the contractor hire two union ironworkers. Defendant DOUGHERTY demanded that the contractor hire all union ironworkers on this job and stated that even one piece of work done by a non-union worker was too much by stating, "But it's ours. One piece is too much." Defendant DOUGHERTY further stated to defendant SWEENEY, "If he puts it up and gets away with it, we're tearing it the fuck down in broad, in broad daylight,

broad fucking daylight. I'll rent the fucking crane from work reservations. So, we're not losing

in center city, man." Defendant DOUGHERTY continued, "I ain't shitting you. . . . We'll take it

right the fuck back down again. And then we'll load it out, rent the truck, and we'll steal the

iron." Indicating that he and his men were prepared to commit crimes on behalf of the union and

were not wearing any clothing which indicated their affiliation with the Ironworkers Local 401,

defendant SWEENEY stated, "we're going to do whatever we had to do . . . nobody had colors

on." SWEENEY added, "We didn't wear colors, we were just, we weren't wearing picket signs.

We were just there."

      31.    On or about July 14, 2013, defendant EDWARD SWEENEY planned to set up a

picket line of a contractor at a construction site located near the intersection of 31st Street and

Spring Garden Street over his failure to hire enough union ironworkers. Defendant SWEENEY

planned to bring the "rat" which is a large inflatable rat which the unions use when picketing.

      32.    On or about July 15, 2013, defendants EDWARD SWEENEY, JAMES WALSH,

and other members of the Ironworkers Local 401 set up a picket line which blocked both

entrances of a contractor at a construction site located near the intersection of 31st Street and

Spring Garden Street over his refusal to hire enough union ironworkers.

      33.    On or about July 15, 2013, defendant WILLIAM O'DONNELL spoke to the

contractor at a construction site located near the intersection of 31st Street and Spring Garden

Street. Defendant WILLIAM O'DONNELL insisted that the contractor hire union ironworkers

even though the contractor reported that the job was "all non-union" and that he would not make

any money if he hired unwanted and unnecessary union ironworkers.

      34.    On July 15, 2013, defendant EDWARD SWEENEY spoke to the contractor at a

construction site located near the intersection of 31st Street and Spring Garden Street. Defendant

SWEENEY insisted that the contractor hire all union ironworkers even though the contractor suggested he might be able to hire two union ironworkers.

35.     On or about July 15, 2013, defendant EDWARD SWEENEY conveyed the offer from the contractor at a construction site located near the intersection of 31st Street and Spring Garden Street to defendant JOSEPH DOUGHERTY that the contractor hire two union ironworkers for the Ironworkers Local 401 to end their blockade of the construction site. Defendant DOUGHERTY rejected the contractor's offer by stating, "I'd tell him to go fuck his self."

36.     On or about July 16, 2013, defendant JAMES WALSH conducted reconnaissance at the building at 4900 Grays Avenue where he intended to burn property in retaliation for the contractor's failure to hire union ironworkers.

37.     On or about July 21, 2013, defendants JAMES WALSH and WILLIAM GILLIN traveled to the building located at 4900 Grays Avenue and used the acetylene torch to burn through the steel support columns in that building in retaliation for the contractors' failure to hire union ironworkers.

38.     On or about July 22, 2013, defendants JAMES WALSH and EDWARD SWEENEY discussed whether to set up a picket line at 4900 Grays Avenue.  Defendant SWEENEY told defendant WALSH that he did not want to set up a picket line and that he did not want to "go near there" for fear that he might be connected to the arson which defendants WALSH and WILLIAM GILLIN had committed the day before.

39.     On or about July 23, 2013, a union contractor reported to defendant EDWARD SWEENEY that he had been hired to fix the steel support columns in the building located at 4900 Grays Avenue which defendants JAMES WALSH and WILLIAM GILLIN had burned and

damaged with the acetylene torch two days before. A union contractor reported to defendant SWEENEY that "somebody had tried to cut his [the non-union contractor's] building down."

40.    On or about July 23, 2013, defendant EDWARD SWEENEY spoke to a union contractor about the building at 4900 Grays Avenue. The union contractor reported to defendant SWEENEY that the non-union contractor at that location was "not a bad guy" and that he had hired union workers in the past. The union contractor reported to defendant SWEENEY that his union ironworkers would complete the job at 4900 Grays Avenue having replaced the non-union workers.

41.    On or about July 23, 2013, defendant EDWARD SWEENEY bragged to defendant CHRISTOPHER PROPHET about convincing the contractor at 4900 Grays Avenue to hire union ironworkers.

42.    On or about July 29, 2013, defendant EDWARD SWEENEY spoke to defendant WILLIAM O'DONNELL about a jurisdiction dispute with another building trade union at a building being constructed near the intersection of 19th and Arch Streets in Philadelphia. Defendant SWEENEY reported to defendant WILLIAM O'DONNELL that defendant JOSEPH DOUGHERTY was considering "shutting the whole city down tomorrow" and ordering every ironworker on every job to come down to 19th and Arch Streets as a show of strength against the other union. Showing his willingness to break the law, defendant SWEENEY exclaimed, "fuck the labor charges. It's one of those things. You know what? It's gotta be what it's gotta be. You know what I mean. You can't keep tip-toeing around. Can't keep tip-toeing around, worrying about labor charges and let them just keep taking our work." Defendant WILLIAM O'DONNELL stated, "I guess we don't leave until the cops come and lock everyone up."

28

43.     On or about July 29, 2013, relating to the dispute at 19th and Arch Streets, defendant WILLIAM O'DONNELL reported to defendant EDWARD SWEENEY that he had arranged for six union ironworkers to physically block the other union from unloading a truck containing building materials.

44.     On or about July 29, 2013, defendant JOSEPH DOUGHERTY ordered defendant EDWARD SWEENEY to have union ironworkers continue to physically block a truck containing building materials from being unloaded at the construction site at 19th and Arch Streets by stating, "We should be concentrated on those trucks so they can't get them unloaded."

45.     On or about July 29, 2013, defendant EDWARD SWEENEY ordered defendant WILLIAM O'DONNELL to punch an official with another union at the construction site at 19th and Arch by stating, "Knock him out man. . . . Knock him out, I'm serious. . . . I'm coming up right now, I'm leaving . . . . I'm gonna show up on my bike and I'm gonna knock him the fuck out."

46.     On or about July 29, 2013, defendant EDWARD SWEENEY prepared for a street brawl with another union by calling defendant RICHARD RITCHIE. Defendant SWEENEY told defendant RITCHIE that the other union had called their "goons" to come down to the construction site at 19th and Arch. Defendant SWEENEY instructed defendant RITCHIE, "So if you know any goons, send 'em down."

47.     On or about July 29, 2013, defendant EDWARD SWEENEY prepared for a street brawl with another union by calling a union ironworker who is apparently known for his fighting ability and instructed him to report to 19th and Arch Streets. Defendant SWEENEY explained that "We're fighting right now with the [other union]" and that the other union was sending down some "hitters".

29

48.     On July 30, 2013, defendant EDWARD SWEENEY spoke to an official with the other union about the dispute at 19th and Arch Streets.  When the official with the other union refused to accede to defendant SWEENEY's demands, defendant SWEENEY made his intention to use violent conduct clear by stating, "We'll be going to jail then.  We'll be going to jail then."

49.     On or about August 12, 2013, defendant FRANCIS SEAN O'DONNELL organized a picket line at a construction site in Ridley which was not using union ironworkers. Defendant FRANCIS SEAN O'DONNELL instructed the Ironworkers Local 401 members working the picket line to block the front gate so that the contractor could not deliver materials or employees to the construction site to force the contractor to hire union ironworkers.

50.     On or about August 13, 2013, defendant FRANCIS SEAN O'DONNELL, after learning that the non-union contractor had managed to deliver material through a back gate, instructed the Ironworkers Local 401 members on a picket line in Ridley to block both the front and the back gates to a construction site in an attempt to force the contractor to hire union ironworkers.

51.     On or about August 13, 2013, defendant FRANCIS SEAN O'DONNELL, as a way of harassing the non-union and forcing him to hire union ironworkers contacted, or caused to be contacted, a rental company providing equipment to a non-union contractor at a construction site in Ridley where the Ironworkers Local 401 was picketing and indicated to the rental company that they should come pick up their equipment before the contractor had completed the necessary work.

52.     On or about August 14, 2013, defendant FRANCIS SEAN O'DONNELL called defendant JOSEPH DOUGHERTY and informed him that he had reached an agreement with the owner of a construction site to hire two union ironworkers in exchange for the Ironworkers Local

401 picket line and other harassment would end. Defendant FRANCIS SEAN O'DONNELL reminded defendant DOUGHERTY that they had previously agreed to pay for the damage that defendant EDWARD SWEENEY inflicted upon one of the contractors' vehicles as part of this deal. Taking responsibility for this prior extortionate act of his union, defendant DOUGHERTY replied, "Just ask for the bill. We'll reimburse him."

53.     On or about August 28, 2013, defendant EDWARD SWEENEY spoke to a member of the Ironworkers Local 401 about the continuing problems with the other union at the 19th and Arch Streets construction site. Defendant SWEENEY related that "I hate to say it, you wish to get cancer. You hope you get cancer so you can go there and just shoot every mother fucker [member of the other union] down there. You just want to get cancer and just, go there and shoot everybody. It's insane man, to have, to actually, to wish, you know you would die so that you can go down there and kill them."

54.     On or about August 28, 2013, defendant RICHARD RITCHIE bragged to defendant JOSEPH DOUGHERTY about how he showed defendant WILLIAM O'DONNELL how to threaten and extort non-union contractors into hiring union ironworkers. Defendant RITCHIE related an incident which took place at a construction site located at 30th and Market Streets in Philadelphia where he threatened some non-union workers by stating that he would call "300 ironworkers" and that they would "come down and fuck you [non-union workers] up for being a scumbag." RITCHIE further related that he told the non-union workers, "But you know and I know that you're doing our work."

55.     In or about September, 2013, defendant JOSEPH DOUGHERTY and defendant EDWARD SWEENEY entered into an agreement on behalf of the Ironworkers Local 401 with a non-union contractor to hire two union ironworkers so that the Ironworkers Local 401 would not

31

"sabotage" its construction site.  Defendant JOSEPH DOUGHERTY and defendant EDWARD

SWEENEY understood that the non-union contractor was paying both union ironworkers "to do

nothing" and to prevent their equipment from being sabotaged.

56.     On or about September 19, 2013, defendant JAMES WALSH spoke to an

Ironworkers Local 401 official "TC" about an opening on the board of trustees.  Official "TC"

told defendant WALSH that he was not getting the position but that defendant WALSH should

not get "discouraged".  Official "TC" explained that the person who was getting the position

committed criminal acts on behalf of the Ironworkers Local 401 "out in the counties that you do

in the city".  Official "TC" stated that defendant EDWARD SWEENEY nominated defendant

WALSH for the position and told Official "TC" about the criminal acts which defendant

WALSH committed on behalf of the Ironworkers Local 401.  Official "TC" explained to

defendant WALSH that he already knew about defendant WALSH's criminal activities.

57.     On or about September 19, 2013, defendant JAMES WALSH reported to

defendant WILLIAM GILLIN that he was not getting the open trustee position.  Defendant

WALSH told defendant GILLIN that he did not know who was getting the position but that it

was someone who also committed criminal activities on behalf of the Ironworkers Local 401.

Denigrating the criminal contributions of other members of the Ironworkers Local 401 in

comparison to their own criminal acts, defendant GILLIN exclaimed to defendant WALSH that

the position was probably going to "[name of union ironworker] or one of them who fucking do

stupid shit like hit two bolts and go yeah, we got it".

58.     On or about September 20, 2013, defendant EDWARD SWEENEY directed other

members of the Ironworkers Local 401 to stop a non-union contractor from unloading materials

at a construction site near the intersection of Race Street and Delaware Avenue in Philadelphia.

59.     On or about September 20, 2013, defendant EDWARD SWEENEY and other members of the Ironworkers Local 401 extorted a non-union contractor at a construction site near the intersection of Race Street and Delaware Avenue in Philadelphia and forced that contractor to hire one union ironworker and one worker from another union.  Demonstrating his knowledge that the union ironworker was unnecessary and unwanted, defendant SWEENEY noted that the union ironworkers did not even know how to perform the work the contractor had hired him to do.

60.     On or about September 27, 2013, defendant JOSEPH DOUGHERTY and defendant EDWARD SWEENEY discussed the Ironworkers Local 401's financial problems. Summing up the motivation for the IRONWORKERS's dispute with both the non-union contractors and the carpenters union, defendant DOUGHERTY explained, "that's what makes me even more aggravated at the fucking carpenter or whoever, non-union and the carpenter, whoever . . . steals our fucking work.  Every hour they steal that's another hour less money we got coming in" to help the Ironworkers Local 401's financial problems.

61.     On or about October 3, 2013, defendants EDWARD SWEENEY and JAMES WALSH threatened the foreman of a non-union construction company by stating that they would "kick his fucking [ass]" and "sabotage this motherfucking job".

62.     On or about October 3, 2013, defendant JOSEPH DOUGHERTY ordered defendants EDWARD SWEENEY and JAMES WALSH not to sabotage a non-union contractor working on a communications tower because he was concerned that such an act would result in federal criminal charges.

63.     On or about October 3, 2013, defendant RICHARD RITCHIE told defendant JOSEPH DOUGHERTY that "You're always gonna be the Jimmy Hoffa of this local.  You made

33

this union. You carry this union, and you're always gonna be this union. And there ain't no

other fucking way about it. Everybody knows that. You got the biggest army of anybody

whether it be with the ironworkers, or whether they're not with the ironworkers."

     64.     On or about October 8, 2013, defendant JAMES WALSH called a construction

supply company and inquired about purchasing replacement acetylene and oxygen tanks for the

Ironworkers Local 401's acetylene torch which defendant WALSH intended to use to commit

arson and sabotage at a non-union construction site in Malvern in retaliation for their failure to

hire union ironworkers.

     65.     On or about October 9, 2013, defendants JAMES WALSH and WILLIAM

GILLIN planned an operation to use an acetylene torch to commit arson and sabotage at a non-

union construction site in Malvern in retaliation for their failure to hire union ironworkers.

     66.     On or about October 9, 2013, defendant JAMES WALSH recruited defendant

GREG SULLIVAN to drive him and defendant WILLIAM GILLIN to a construction site in

Malvern where they intended to use an acetylene torch to commit arson and sabotage at a non-

union construction site in retaliation for their failure to hire union ironworkers. Defendant

WALSH related to defendant SULLIVAN that it could be "good" for his career with the

Ironworkers Local 401 if he participated in this criminal act on behalf of the union.

     67.     On or about October 9, 2013, defendant JAMES WALSH spoke to an official

with the Ironworkers Local 401 about the acetylene torch he had taken to use to commit arson

and sabotage at a non-union construction site in Malvern in retaliation for their failure to hire

union ironworkers. When the union official questioned defendant WALSH about his authority to

take the acetylene torch, defendant WALSH explained, "I got it from Joe [DOUGHERTY], Joe

knows I have it." Defendant WALSH continued, "I mean, Joe [DOUGHERTY] knows I have it,

and Eddie [SWEENEY] knows I have it, and Sean [O'DONNELL] knows I have it, and Chris [PROPHET], and Billy [O'DONNELL]." Defendant WALSH explained, "I have the whole tote, with the gas and air. And then yesterday, I got another gas and air. So there's two gas and two air." Defendant WALSH noted, "The last time I used it, the air, I ran out of air."

68.     On or about October 9, 2013, defendant JOSEPH DOUGHERTY called defendant EDWARD SWEENEY about defendant JAMES WALSH's use of the acetylene torch. Defendant DOUGHERTY wanted to ensure that defendant WALSH did not use the acetylene torch to sabotage the communications tower where he had previously been working. Defendant SWEENEY explained that defendant WALSH was not going to use the torch to sabotage that job site but that he was working for defendant FRANCIS SEAN O'DONNELL and was going to use them to commit arson and otherwise sabotage another job site. Defendant DOUGHERTY authorized that action by stating, "that's good. Alright. He just got to be careful."

69.     On or about October 11, 2013, defendants FRANCIS SEAN O'DONNELL and JAMES WALSH reconnoitered a construction site in Malvern where they intended to use an acetylene torch to commit arson and sabotage at a non-union construction site in retaliation for their failure to hire union ironworkers.

70.     On or about October 12, 2013, defendant FRANCIS SEAN O'DONNELL authorized defendants JAMES WALSH, WILLIAM GILLIN, and GREG SULLIVAN to commit arson and otherwise sabotage a construction site in Malvern in retaliation for the contractor's failure to hire union ironworkers. Initially, defendant FRANCIS SEAN O'DONNELL expressed concern over the "paper trail" which defendant WALSH had created by sending the bill for the replacement acetylene and oxygen tanks to the Ironworkers Local 401 office. Defendant FRANCIS SEAN O'DONNELL stated that "I'll take care of it during the

week." When defendant WALSH noted that they were already "a mile away" from the construction site, defendant FRANCIS SEAN O'DONNELL authorized them to proceed with the arson.

71.    On or about October 12, 2013, defendants JAMES WALSH, WILLIAM GILLIN, and GREG SULLIVAN drove to the construction site in Malvern with the acetylene torch with the intention of committing arson and otherwise sabotaging the construction site in retaliation for the contractor's failure to hire union ironworkers.

72.    On or about December 4, 2013, after the non-union contractor had agreed to hire union workers, defendant JOSEPH DOUGHERTY authorized payment in the form of a check for $415.52 from the Ironworkers Local 401 account to the non-union contractor for damage caused by defendant EDWARD SWEENEY during a picket of the non-union contractor.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     The Ironworkers Local 401, as described more particularly in paragraphs 1 through 13 of Count One, which are realleged here, constituted an enterprise, as that term is defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact, which was engaged in, and the activities of which affected, interstate commerce.

2.     The Ironworkers Local 401, through its members and associates, were engaged in racketeering activity, as defined in Title 18, United States Code, Section 1959(b)(1) and 1961(1), namely acts involving arson and extortion in violation of Pennsylvania state law, and acts indictable under 18 U.S.C. § 844(i) (arson) and 18 U.S.C. § 1951 (extortion).

3.     On or about June 23, 2010, in King of Prussia, in the Eastern District of Pennsylvania, for the purpose of maintaining and increasing position in the Ironworkers Local 401, an enterprise engaged in racketeering activity, defendant

### RICHARD RITCHIE

knowingly and intentionally assaulted with a dangerous weapon, that is, a baseball bat, and aided and abetted the assault with a dangerous weapon, of persons known to the grand jury, in violation of the laws of the Commonwealth of Pennsylvania, that is, Title 18 Pennsylvania Consolidated Statutes Annotated Sections 2702 and 2301.

All in violation of Title 18, United States Code, Section 1959(a)(3) and 2.

## COUNT THREE

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about December 20, 2012, in Philadelphia, in the Eastern District of Pennsylvania, defendants

**JOSEPH DOUGHERTY,**
**EDWARD SWEENEY,**
**JAMES WALSH,**
**WILLIAM GILLIN, and**
**DANIEL HENNIGAR**

maliciously damaged and destroyed, and aided, abetted, counseled, commanded, induced, and procured the malicious damaging and destruction of, by means of fire, a building and other property, used in interstate commerce and in activities affecting interstate commerce, that is, a Quaker Meetinghouse being constructed at 20 East Mermaid Lane in Philadelphia, and construction equipment, including a crane, being used to construct that building.

All in violation of Title 18, United States Code, Sections 844(i) and 2.

## COUNT FOUR

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about December 20, 2012, in Philadelphia, in the Eastern District of Pennsylvania, defendants

**JOSEPH DOUGHERTY,**
**EDWARD SWEENEY,**
**JAMES WALSH,**
**WILLIAM GILLIN, and**
**DANIEL HENNIGAR**

knowingly used fire, and aided, abetted, counseled, commanded, induced, and procured the knowing use of fire, to commit a felony, that is, RICO conspiracy and extortion, which may be prosecuted in a court of the United States.

In violation of Title 18, United States Code, Sections 844(h) and 2.

39

## COUNT FIVE

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about July 21, 2013, in Philadelphia, in the Eastern District of

Pennsylvania, defendants

**JOSEPH DOUGHERTY,
EDWARD SWEENEY,
JAMES WALSH, and
WILLIAM GILLIN,**

maliciously damaged and destroyed, and aided, abetted, counseled, commanded, induced, and

procured the malicious damaging and destruction of, by means of fire, a building, used in

interstate commerce and in activities affecting interstate commerce, that is, a warehouse being

constructed at 4900 Grays Avenue in Philadelphia.

All in violation of Title 18, United States Code, Sections 844(i) and 2.

## COUNT SIX

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about July 21, 2013, in Philadelphia, in the Eastern District of

Pennsylvania, defendants

**JOSEPH DOUGHERTY,**
**EDWARD SWEENEY,**
**JAMES WALSH, and**
**WILLIAM GILLIN,**

knowingly used fire, and aided, abetted, counseled, commanded, induced, and procured the

knowing use of fire, to commit a felony, that is, RICO conspiracy and extortion, which may be

prosecuted in a court of the United States.

In violation of Title 18, United States Code, Sections 844(h) and 2.

## COUNT SEVEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1.  Paragraphs 1 through 13 of Count One of this indictment are realleged here.

2.  From on or about August 28, 2013 to on or about October 12, 2013, in the Eastern District of Pennsylvania, and elsewhere, defendants

**JOSEPH DOUGHERTY,**
**EDWARD SWEENEY,**
**JAMES WALSH,**
**WILLIAM GILLIN,**
**FRANCIS SEAN O'DONNELL, and**
**GREG SULLIVAN**

conspired and agreed together to maliciously damage and destroy by means of fire, a building and property, used in interstate commerce and in activities affecting interstate commerce, that is, a building being constructed at 85 Matthews Road, Malvern, Pennsylvania, and a crane being used in the construction of that building, in violation of Title 18, United States Code, Section 844(i).

**MANNER AND MEANS**

3.  In August 2013, defendants JOSEPH DOUGHERTY, EDWARD SWEENEY, FRANCIS SEAN O'DONNELL, JAMES WALSH, and WILLIAM GILLIN became aware that a non-union company was performing ironworking tasks in the construction of a building located at 85 Matthews Road in Malvern. Defendants DOUGHERTY, SWEENEY, FRANCIS SEAN O'DONNELL, WALSH, GILLIN, and GREG SULLIVAN planned to use an acetylene torch to cut the steel support beams and damage a crane by means of fire in retaliation for the construction company's failure to hire union ironworkers.

42

4.      Defendants JOSEPH DOUGHERTY, EDWARD SWEENEY, and FRANCIS SEAN O'DONNELL provided defendants JAMES WALSH, WILLIAM GILLIN, and GREG SULLIVAN with an acetylene torch to use to commit this arson.  Defendant WALSH then procured gas and oxygen tanks to use to commit this arson.

5.      Prior to the attempted arson, defendants JAMES WALSH and FRANCIS SEAN O'DONNELL reconnoitered the construction site in order to plan the arson.

6.      Defendants JAMES WALSH, WILLIAM GILLIN, and GREG SULLIVAN traveled to the construction site with the acetylene torch with the intention of committing the arson.

## OVERT ACTS

1.      On or about October 8, 2013, defendant JAMES WALSH called a construction supply company and inquired about purchasing replacement acetylene and oxygen tanks for the Ironworkers Local 401's acetylene torch which defendant WALSH intended to use to commit arson and sabotage at the non-union construction site in Malvern in retaliation for their failure to hire union ironworkers.

2.      On or about October 9, 2013, defendants JAMES WALSH and WILLIAM GILLIN planned an operation to use an acetylene torch to commit arson and sabotage at the non-union construction site in Malvern in retaliation for their failure to hire union ironworkers.

3.      On or about October 9, 2013, defendant JAMES WALSH recruited defendant GREG SULLIVAN to drive him and defendant WILLIAM GILLIN to the construction site in Malvern where they intended to use an acetylene torch to commit arson and sabotage at a non-union construction site in retaliation for their failure to hire union ironworkers.  Defendant

WALSH related to defendant SULLIVAN that it could be "good" for his career with the Ironworkers Local 401 if he participated in this criminal act on behalf of the union.

4.      On or about October 9, 2013, defendant JAMES WALSH spoke to an official with the Ironworkers Local 401 about the acetylene torch he had taken to use to commit arson and sabotage at the non-union construction site in Malvern in retaliation for their failure to hire union ironworkers. When the union official questioned defendant WALSH about his authority to take the acetylene torch, defendant WALSH explained, "I got it from Joe [DOUGHERTY], Joe knows I have it." Defendant WALSH continued, "I mean, Joe [DOUGHERTY] knows I have it, and Eddie [SWEENEY] knows I have it, and Sean [O'DONNELL] knows I have it, and Chris [PROPHET], and Billy [O'DONNELL]." Defendant WALSH explained, "I have the whole tote, with the gas and air. And then yesterday, I got another gas and air. So there's two gas and two air." Defendant WALSH noted, "The last time I used it, the air, I ran out of air."

5.      On or about October 9, 2013, defendant JOSEPH DOUGHERTY called defendant EDWARD SWEENEY about defendant JAMES WALSH's use of the acetylene torch. Defendant DOUGHERTY wanted to ensure that defendant WALSH did not use the acetylene torch to sabotage the communications tower where he had previously been working. Defendant SWEENEY explained that defendant WALSH was not going to use the torch to sabotage that job site but that he was working for defendant FRANCIS SEAN O'DONNELL and was going to use them to commit arson and otherwise sabotage another job site. Defendant DOUGHERTY authorized that action by stating, "that's good. Alright. He just got to be careful."

6.      On or about October 11, 2013, defendants FRANCIS SEAN O'DONNELL and JAMES WALSH reconnoitered the construction site in Malvern where they intended to use an

44

acetylene torch to commit arson and sabotage at a non-union construction site in retaliation for their failure to hire union ironworkers.

7.      On or about October 12, 2013, defendant FRANCIS SEAN O'DONNELL authorized defendants JAMES WALSH, WILLIAM GILLIN, and GREG SULLIVAN to commit arson and otherwise sabotage a construction site in Malvern in retaliation for the contractor's failure to hire union ironworkers. Initially, defendant FRANCIS SEAN O'DONNELL expressed concern over the "paper trail" which defendant WALSH had created by sending the bill for the replacement acetylene and oxygen tanks to the Ironworkers Local 401 office. Defendant FRANCIS SEAN O'DONNELL stated that "I'll take care of it during the week." When defendant WALSH noted that they were already "a mile away" from the construction site, defendant FRANCIS SEAN O'DONNELL authorized them to proceed with the arson.

8.      On or about October 12, 2013, defendants JAMES WALSH, WILLIAM GILLIN, and GREG SULLIVAN drove to the construction site in Malvern with the acetylene torch with the intention of committing arson and otherwise sabotaging the construction site in retaliation for the contractor's failure to hire union ironworkers.

All in violation of Title 18, United States Code, Section 844(n).

45

## COUNT EIGHT

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about October 12, 2013, in Philadelphia, in the Eastern District of

Pennsylvania, defendants

**JOSEPH DOUGHERTY,**
**EDWARD SWEENEY,**
**JAMES WALSH,**
**WILLIAM GILLIN,**
**FRANCIS SEAN O'DONNELL, and**
**GREG SULLIVAN**

attempted to maliciously damage and destroy, and aided, abetted, counseled, commanded,

induced, and procured the attempt to maliciously damage and destroy, by means of fire, a

building being constructed at 85 Matthews Road, Malvern, Pennsylvania, and a crane being used

in the construction of that building.

All in violation of Title 18, United States Code, Sections 844(i) and 2.

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      The allegations of Counts One of this indictment are incorporated here for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963, and Title 28, United States Code, Section 2461(c). Pursuant to Rule 32.2, Federal Rules of Criminal Procedure, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 1963 in the event of any defendant's conviction under Count One of this indictment.

2.      Defendants:

**JOSEPH DOUGHERTY,**
**EDWARD SWEENEY,**
**JAMES WALSH,**
**FRANCIS SEAN O'DONNELL,**
**CHRISTOPHER PROPHET,**
**WILLIAM GILLIN,**
**WILLIAM O'DONNELL,**
**RICHARD RITCHIE,**
**DANIEL HENNIGAR, and**
**GREG SULLIVAN**

A.      have acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Sections 1963(a)(1);

B.      have interests in, securities of, claims against, or properties or contractual rights affording a source of influence over the Enterprise in violation of Title 18, United States Code, Section 1962, which are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(2).

C.      have property constituting and derived from proceeds obtained, directly and indirectly, from the aforesaid racketeering activity, in violation of Title 18, United States

47

Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3).

3.    The interests of the defendants subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1962(a)(1), (a)(2), and (a)(3), include but are not limited to:

(a)    any and all proceeds or property derived from proceeds traceable to the racketeering activities alleged in Count One during the relevant time period alleged in this indictment and all interests and proceeds traceable thereto.

(b)    at least four vehicles, including

(1)    a 2011 Ford Taurus, Pennsylvania License Plate GYR 3543, Vehicle Identification Number 1FAHP2JW6BG128658, registered to the Ironworkers Local 401, 11600 Norcom Road, Philadelphia, Pennsylvania and used by defendant EDWARD SWEENEY;

(2)    a 2011 Ford Expedition, Pennsylvania License Plate HYT 1135, Vehicle Identification Number 1FMJU1J51BEF40208, registered to the Ironworkers Local 401, 11600 Norcom Road, Philadelphia, Pennsylvania and used by defendant WILLIAM O'DONNELL;

(3)    a 2012 Ford Expedition, Pennsylvania License Plate GZG 6338, Vehicle Identification Number 1FMJU2A58CEF20030, registered to the Ironworkers Local 401, 11600 Norcom Road, Philadelphia, Pennsylvania and used by defendant CHRISTOPHER PROPHET;

(4)    a 2013 Ford Expedition, Pennsylvania License Plate JDJ 4426, Vehicle Identification Number 1FMJU2A53DEF12886, registered to the Ironworkers Local 401,

11600 Norcom Road, Philadelphia, Pennsylvania and used by defendant FRANCIS SEAN
O'DONNELL.

     4.     If any of the above-described forfeitable property, as a result of any act or
omission of the defendants:

          A.     cannot be located upon the exercise of due diligence;

          B.     has been transferred or sold to, or deposited with, a third person;

          C.     has been placed beyond the jurisdiction of the Court;

          D.     has been substantially diminished in value; or

          E.     has been commingled with other property which cannot be subdivided
                without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to
seek forfeiture of any other property of said defendants up to the value of the above forfeitable
property.

     5.     The above-named defendants, and each of them, are jointly and severally liable
for the forfeiture obligations as alleged above.

         All pursuant to Title 18, United States Code, Section 1963.


                    **A TRUE BILL:**


                    _____
                    **GRAND JURY FOREPERSON**

**ZANE DAVID MEMEGER**
**United States Attorney**

49